**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LESTER W. HILL,

        Plaintiff,

v.                              Case No. 3:16-cv-924-J-32PDB

JEFFREY L. KIRKLAND, et al.,

        Defendants.

_____

<u>**ORDER**</u>

This is an excessive force case with conflicting testimony. But there is video that obviates the evidentiary conflict such that the Court is authorized to grant summary judgment for Defendants.

<u>**I.  Status**</u>

Plaintiff, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983.  He names as Defendants Jeffrey L. Kirkland, Markus Jackson, Janet M. Martin, J. Rogers, J. Shimpfle, and John Doe. Plaintiff paid the filing fee and thus was directed to perfect service of process on Defendants. <u>See</u> Order (Doc. 4). Plaintiff failed to perfect service on Rogers and Shimpfle, and after Plaintiff failed to respond to an Order to Show Cause (Doc. 17), all claims against Rogers and Shimpfle were dismissed. <u>See</u> Order (Doc. 21). Plaintiff subsequently voluntarily dismissed his claims against Martin. <u>See</u> Order (Doc. 23). Because Plaintiff never identified or served the John Doe Defendant, all claims against the Doe Defendant will be dismissed. Thus, the only remaining Defendants are Kirkland and Jackson.

Before the Court is Defendants Kirkland and Jackson's Motion for Summary Judgment (Doc. 36) (Motion), including exhibits (Ex.). The exhibits include excerpts from Plaintiff's deposition (Ex. A); the Declaration of Dr. Albert Maier, to which some of Plaintiff's medical records are attached (Ex. B); the Declaration of Janet Martin with an Incident Report attached (Ex. C); the Declaration of Jeffrey Kirkland with an Incident Report attached (Ex. D); the Declaration of Markus Jackson with an Incident Report attached (Ex. E); the handheld video recordings (3 disks filed under seal) (Doc. S-40; Ex. F); and Plaintiff's prison face sheet (Doc. 37-4; Ex. G). The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment may foreclose subsequent litigation on the matter, and gave him an opportunity to file a response to Defendants' Motion. <u>See</u> Orders (Docs. 4, 38). Plaintiff filed a Brief in Opposition (Doc. 42), and attached thereto a Declaration (Doc. 42-1); portions of his medical records, sick-call requests, and grievances (Doc. 42-2); another grievance and intra-office request (Doc. 42-3); a Declaration of inmate Terrance Barnett and Affidavit by inmate Prentice Mathis (Doc. 42-4); a copy of the disciplinary report he received and a portion of the rules relating to property restriction (Doc. 42-5); and copies of the Defendants' Declarations (Doc. 42-6). He also filed a Statement of Contested Material Facts (Doc. 43).

## II.  Summary of Parties' Pertinent Filings

### A.  Plaintiff's Complaint[1]

On October 25, 2012, around 9:00 a.m., Plaintiff was asleep in his cell on close management segregation at Suwannee Correctional Institution (Suwannee). He awoke to a loud banging and kicking on his cell door by Janet Martin. Plaintiff sat up and asked Martin what was wrong. Martin, who was accompanied by Officer Fogel, advised Plaintiff that it was time for a cell inspection. Plaintiff explained to Martin that he was unaware of any cell inspection because he had just arrived at Suwannee the day before. Martin then became aggressive and asked Plaintiff whether the shirt he was wearing was state-issued or personal. Plaintiff told her it was personal, and Martin ordered him to remove the shirt and give it to her. Plaintiff refused. Martin then ordered Plaintiff to cuff up (submit to hand restraints), and advised him that he was going on "strip" (72-hour property restriction) for destruction of state property and because Martin did not like Plaintiff's attitude. Plaintiff told Martin that he had done nothing wrong, and she told Plaintiff she was going to take whatever property Plaintiff had. Martin again ordered Plaintiff to cuff up. Plaintiff repeated that he had done nothing wrong, and refused to submit to hand restraints. Martin asked Plaintiff whether he was refusing, and he confirmed that he was not going to cuff up and that he was protesting her invalid order.

---

[1] The Court credits the "specific facts" pled in Plaintiff's sworn Complaint when considering the summary judgment Motion.  See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014) (citations omitted).

As a result of Plaintiff's refusal to cuff up and go on "strip," Martin sprayed Plaintiff three times with chemical agents. After the third application of chemical agents, a cell extraction team was formed. Martin asked Plaintiff if he was still refusing to cuff up, and Plaintiff remained silent. Plaintiff's cell door was opened and the extraction team, which included Defendants Kirkland and Jackson, rushed into Plaintiff's cell.

After a brief struggle with the extraction team, Plaintiff was slammed on his back on top of the bunk inside his cell. Kirkland pounced on Plaintiff and grabbed Plaintiff under his chin with one hand and placed his other hand behind Plaintiff's head, and then violently twisted Plaintiff's head. Plaintiff was able to knock away one of Kirkland's hands, but Kirkland grabbed hold of Plaintiff again and twisted his neck a second time. Plaintiff was fighting for his life and was able to once again break free from Kirkland's grip.

Kirkland and Jackson then grabbed Plaintiff and turned him onto his stomach. Jackson jumped on top of Plaintiff's back, took Plaintiff's left arm and twisted it behind his back, and placed a hand cuff on Plaintiff's wrist. He then grabbed Plaintiff's right arm and was able to completely secure the handcuffs on Plaintiff.

With Plaintiff lying on his stomach and handcuffs on his wrists, Kirkland crouched down toward Plaintiff's head and began to violently and repeatedly punch Plaintiff in the face. Kirkland then attacked Plaintiff's left eye, by sticking his finger into and behind Plaintiff's eyeball. Kirkland was attempting to dislodge Plaintiff's eyeball, but was unable to do so. Kirkland then stuck his thumb in Plaintiff's left eye and twisted it back and forth. While Kirkland was doing so, Jackson was punching Plaintiff in the head while sitting on top of

4

Plaintiff's back. Jackson repeatedly punched and elbowed Plaintiff numerous times in the head, neck, and skull.

At one point during the beating, Jackson grabbed Plaintiff's head and began to pound it into the edge of the steel bunk, and one of the cell extraction team members grabbed hold of Plaintiff's left thumb and bent it viciously backwards. The beating stopped when Kirkland and Jackson were exhausted and breathing heavily, at which time Martin ordered them to lift Plaintiff to his feet. Martin witnessed the beating and assisted Defendants by yelling for Plaintiff to "stop resisting" after Plaintiff was already restrained and was being beaten by Defendants.

After Plaintiff was removed from his cell, he received a decontamination shower. A nurse came to examine Plaintiff and documented some of his visible injuries, but Plaintiff refused medical treatment. He was then escorted back to his cell, and all of his property had been removed. He spent the next 72 hours in a cold, chemically-polluted cell without a mattress to sleep on.

As a result of the beating, he suffered trauma to his left eye with possible permanent visual impairment, and his left hand was seriously and potentially permanently injured. He also suffered a severe injury to his neck with continued pain and possible permanent injury. He had a concussion, and massive swelling and bruising to the left side of his face and portions of his skull. He had a deep laceration on the inside of his mouth and a laceration on his right forearm that was approximately 4 inches long. Plaintiff also had minor abrasions and lacerations on his face and body.

**B. Defendants' Motion**

Defendants move for summary judgment in their favor for the following reasons: (1) the amount of force used was necessary to restore order and was reasonable under the circumstances; (2) Plaintiff is not entitled to compensatory or punitive damages because he did not suffer more than a de minimis physical injury; and (3) Defendants are entitled to qualified immunity.

Martin, who was the Lieutenant present on the date of the incident and who was formerly named as a Defendant, states in pertinent part:

> Hill's allegations are absolutely untrue. The cell extraction team used only the minimal amount of force required to overcome Hill's resistance and regain his compliance to lawful orders.
>
> . . . .
>
> During the morning of October 25, 2012, Hill was causing a disturbance and refusing to comply with my lawful order to submit to hand restraints. After it was confirmed that there were no known conditions or circumstances that would be exacerbated by the use of chemical agents against Hill, the Duty Warden was contacted and he authorized the use of chemical agent Oleoresin Capsicum (OC). Video recording was initiated and I gave Hill a final warning to cease his behavior and submit to hand restraints. Hill continued to refuse to submit to hand restraints. During the three applications of OC, Hill actively attempted to grab hold of the OC canister and physically assault staff. During the second application, Hill seized Officer Hector Lopez's arm and force was utilized to break Hill's grasp. After the final application of chemical agents, Hill continued to refuse to submit to hand restraints.
>
> A forced cell extraction team was assembled, following authorization of the duty warden, in response to Hill's continued refusal to submit to hand restraints. After Hill refused a final time to submit to hand restraints, the cell extraction team entered the cell and placed restraints onto Hill under my

supervision. During this time, I only witnessed the minimal amount of force necessary to gain Hill's compliance.

Prior to the arrival of the extraction team, Hill covered the window of his cell with a t-shirt, preventing myself or other staff members from seeing into his cell. When Hill's cell door was rolled open, Hill initiated contact with the non-electric shield carried by Officer Kirkland by aggressively lunging out of his cell. Hill continued to use physical resistance until the officers were able to place wrist and ankle restraints onto him.

Following the cell extraction, Hill was escorted to the shower and instructed to decontaminate with cool water. During this time, Hill made repeated threats to harm officers, stating, "I'm going to stab your ass" amongst other threats. Hill refused to be examined by medical staff.

Ex. C (internal citations and paragraph enumeration omitted).

Defendant Kirkland filed the following Declaration in support of the Motion:

Hill's allegations against me are absolutely untrue. I only used the minimum amount of force necessary to gain Hill's compliance during the incident.

. . . .

I was the number one member of the cell extraction team for Hill. Upon entering Hill's cell, I used the non-electronic shield and then my body weight to pin Hill to the bunk. Upon Hill's cell door first opening, Hill lunged directly at me through the door. I utilized force, along with the other members, to overcome Hill's resistance. Once Hill came into compliance, I stopped my use of force. At no point did I utilize any type of force in an effort to punish or injure Hill.

I used the minimum force necessary to overcome Hill's resistance and regain his compliance with lawful orders.

Ex. D (internal citations and paragraph enumeration omitted).

Defendant Jackson's Declaration states as follows:

Hill's allegations against me are absolutely untrue. I only used the minimum amount of force necessary to gain Hill's compliance during the incident.

. . . .

I was the number three member of the cell extraction team for Hill. Upon entering Hill's cell, I gained control of his left arm by grasping it with both my hands. With the help of Sergeant Shawn Baxley, the number two member of the extraction team, I placed restraints on Hill's wrists. I maintained [m]y grasp until all restraints were applied and Hill's resistance ceased.

I used the minimum force necessary to overcome Hill's resistance and regain his compliance with lawful orders.

Ex. E (internal citations and paragraph enumeration omitted).

### C. Plaintiff's Response

Plaintiff largely reiterates the factual assertions made in his Complaint, and argues that the declarations of Defendants and his declaration are squarely contradictory as to what amount of force was used, when it was used, and why it was used. Plaintiff asserts that he "was beaten as punishment for refusing to submit to hand restraints in order to be placed on Strip . . . and because Plaintiff became combative during the 2nd and 3rd applications of chemical agents." Doc. 42 at 4. "Plaintiff concedes that in light of him refusing all orders to submit to hand restraints some degree of force may have been lawful, but challenges the assault and beating that occurred after he was down, restrained, and no longer resisting." Id.

Another inmate, Terrance Barnett, submitted a Declaration, stating that he was waiting to see his mental health counselor and could see Plaintiff's cell from his location. Doc. 42-4 at 2. He witnessed Martin counsel with Plaintiff, and Plaintiff's refusal to cuff up.

8

He also witnessed the administration of chemical agents, the cell extraction, and Plaintiff's shower and return to his cell. See id. at 2-4. He states, in pertinent part:

> I saw Mr. Hill appear at the very front of the cell door and met the extraction team . . . the correctional officer at the front of the cell extraction team had a large plexiglass riot shield and he hit Mr. Hill with it, knocking Mr. Hill backwards[.] I then saw Mr. Hill lunge forward trying to make it to the door again but was grabbed by "3" extraction team members. I then witnessed Mr. Hill being slammed on top of an empty bunk inside his cell, now that Mr. Hill was down and the extraction team officers was on top of him and crowding around him; I lost sight of Mr. Hill[.] I was trying to see what was happening inside the cell but now my view was obstructed . . . . I did see Lt. Martin slip inside the cell approximately 5 minutes, when Mr. Hill was finally taken out of the cell I was "shocked" by what I saw[.] Mr. Hill had to be carried out of the cell because he was half unconscious, his face was seriously damaged, he had blood coming out of his left eye, blood was coming from his nose and mouth . . . I observed that his face was severely deformed from swelling and bruising, he also had lumps or mounds on his skull and head area. . . . Once Mr. Hill was brought out by the team of officers some of them notice that I was looking at Mr. Hill and they told me to turn around or "I would be next"; so I was forced to face the wall[,] but at times look towards Mr. Hill's direction and seen the damage that had been done to him. . . . Also while I was observing the scene I notice that Mr. Hill was pointing at c/o Kirkland in particular, I could not hear what he was saying; but I looked towards the extraction huddle of officers and I noticed that Mr. Hill was talking to Officer Kirkland because he was smiling at Mr. Hill; he didn't say anything he just continued to smile at Mr. Hill!

Id. at 3-4.

Inmate Mathis' affidavit addresses what he was told by an Officer Baker the day after Plaintiff's cell extraction. Doc. 42-4 at 5. According to inmate Mathis, Officer Baker told him that "they had cell extracted an inmate yesterday and if [the inmates] don't want to end up like him [(apparently, Plaintiff)] that [the inmates] had better do every and anything an officer

9

tells [them] to do while here at Suwannee cause they have no problem 'kicking ass.'" Id. Inmate Mathis then went to see Plaintiff, and he noticed that Plaintiff's "eyes were black and blue swollen and he had large lumps on his head." Id.

### D. Video Evidence[2]

Three video disks were filed under seal. The first and second video disks are from the same handheld camera; the third is from a second handheld camera. The following is a summary of what is shown on the videos.

#### 1. First Video

On October 25, 2012, at 10:16 a.m.,[3] Martin provided an introductory statement. She explained that Plaintiff was creating a disturbance on the wing by yelling obscenities and refusing to cuff up (submit to hand restraints) for purposes of being placed on property restriction due to his destruction of a state-issued t-shirt. According to Martin, three correctional staff members, including Martin, unsuccessfully attempted to counsel with Plaintiff and obtain his compliance. Martin indicated that she used crisis intervention techniques, but Plaintiff refused to comply. Martin confirmed that Plaintiff had no known medical conditions that would be exacerbated by the use of chemical agents and medical staff stated the use of chemical agents would not endanger his health. She advised that the duty warden authorized the use of chemical agents to bring Plaintiff into compliance if

---

[2] The videos have not been transcribed by a court reporter. When quotations are provided, they reflect the Court's best efforts to transcribe what occurred on the videos.

[3] The specific times given were announced by the camera operator as the time on the handheld camera.

necessary. She expressed that her intent was to use chemical agents only if necessary after all other reasonable non-force intervention techniques failed.

At 10:18 a.m., Martin approached Plaintiff's cell, and Plaintiff was standing at the door. Martin warned Plaintiff that if he failed to comply with orders, staff would use chemical agents on him. She asked Plaintiff if he understood, but Plaintiff remained silent. Martin acknowledged that Plaintiff had ceased his disruptive behavior, but he still would not submit to hand restraints. She asked him several times to submit to hand restraints, but Plaintiff remained silent while standing at the cell door. Martin gave Plaintiff an additional warning and walked away from his cell at 10:20 a.m.

The camera operator stayed outside of Plaintiff's cell. Plaintiff walked farther into his cell, out of the camera's view. A staff member approached Plaintiff's cell and chained his cell door to the adjacent cell door. Plaintiff appeared at the cell door, watching whatever was occurring outside of his cell. Shortly after the camera operator announced the time as 10:24 a.m., Plaintiff began wrapping a towel around his head preparing for the use of chemical agents. When Martin re-approached his cell and asked if he was going to submit to hand restraints, Plaintiff remained silent while standing at his cell door. Plaintiff also held "blues"[4] in his hand in preparation for the chemical agents. Martin directed Plaintiff to not stick his arm or any body part out of the door. Plaintiff refused to move back from the cell door despite being ordered to do so. A staff member with a shield stood at Plaintiff's cell door and blocked the opening, Martin partially opened the door, and another staff member held the canister of chemical agents. When the door partially opened, Plaintiff tried to block the

_____

[4] Apparently, "blues" refers to state-issued clothing.

chemical spray with clothing. Three bursts of chemical agents were sprayed into Plaintiff's cell. The camera operator stated the time as 10:28 a.m.

Staff walked away from Plaintiff's cell, but the camera operator remained. About two minutes later, the staff member who held the shield during the chemical sprays approached Plaintiff's cell and asked whether he was going to cuff up, but Plaintiff did not respond. Around 10:32 a.m., Martin approached Plaintiff's cell and asked him if he would cuff up, and Plaintiff responded, "cuff up for what?" Plaintiff stood at the cell door preparing to block the spray with clothing, and Martin warned him about sticking his hand out of the door. When the door opened for the second administration of chemical agents, Plaintiff shoved clothing into the opening, but the staff member holding the shield was able to knock the clothing out of the door. Plaintiff violently reached out of the cell door with clothing in his hand, and staff took the clothing. Plaintiff had more clothing in his hand and used it to try to block the chemical spray, and a scuffle ensued with Plaintiff grabbing and holding on to a staff member's arm. Repeated punches to Plaintiff's forearm were used in an attempt to break Plaintiff's grasp. There was a brief tug-of-war with clothing items through the open door. Once the door was closed, the camera operator announced the time as 10:34 a.m. Three bursts of chemical agents were sprayed into Plaintiff's cell during this encounter.

Around 10:41 a.m., Martin approached Plaintiff's cell and asked if Plaintiff was ready to cuff up. Plaintiff did not answer. Instead, he wrapped a towel around his head. Martin warned him not to stick his arm out of the door, and Plaintiff stated, "I'm coming out." Martin, apparently believing that Plaintiff was ready to cuff up and exit his cell, asked him to turn around. Plaintiff, however, clarified, that he was "coming out to get that f*ck boy there."

12

Plaintiff stood at his cell door with additional cloth item(s) in his hand, and stated, "If I can grab you and pull you through this door, that's what [I'll] do." The cell door was partially opened, and Plaintiff aggressively attempted to grab the canister while verbally taunting staff. After several attempts at trying to spray into Plaintiff's cell, Plaintiff began pounding on his cell door and threatening to take the canister and spray everybody. His cell door was closed. Staff walked away from Plaintiff's door, amidst Plaintiff yelling threats about getting the canister and spraying everyone. He can be seen apparently attempting to wipe up the floor of his cell. He yelled to another inmate, repeatedly yelled for staff to "take a break," and threatened to get the canister and spray staff.

At 10:52 a.m., Martin approached the cell and asked if Plaintiff would cuff up. He again stated that he would grab the canister of chemical agents. He wrapped a towel around his head and held other cloth item(s) in his hand and threatened that he was going to "get that mother f*cker this time." When the door was partially opened, Plaintiff attempted to grab the canister by reaching out of the door with one hand while holding the cloth item up to block the spray with his other hand. He told the sergeant (the staff member holding the shield) that if he got the canister, the sergeant should get out of the way so he could spray the "LT" (Martin) and everyone else. One shot was sprayed into Plaintiff's cell, while Plaintiff taunted the staff member who was holding the canister. Plaintiff called him a "mother f*cker" and a "coward," and told him, "Come up here," "get your ass up here," "get your mother f*cking ass up here," "go ahead come on . . . skinny mother f*cker." He also threatened to "kick [his] mother f*cking head." Plaintiff repeatedly stuck his arm out of the door in an attempt to grab the canister. Staff was able to take a cloth item(s) from Plaintiff as he tried

13

to use it to block the spray. Two more bursts were sprayed into Plaintiff's cell, and the door was closed. The time was announced as 10:54 a.m. After a few seconds, Plaintiff can be seen through the window on his cell door nodding his head and walking around his cell.

The sergeant approached and asked Plaintiff if he would cuff up. Plaintiff exclaimed, "Ain't nothing pu**y about me man." Two other staff members, including Martin, asked Plaintiff to cuff up. Plaintiff walked around his cell and wiped the window off. Martin again approached Plaintiff's cell and asked him to cuff up to get a shower and be seen by medical. A captain also asked him to come out and get a shower. Plaintiff told the captain, "She's trying to take my sh*t for no reason, captain, . . . no I ain't cuffing up." The time was announced as 10:59 a.m.

During the next five minutes, Plaintiff walked around his cell and looked out the window on his cell door at times. At 11:04 a.m., Martin approached Plaintiff's cell with a nurse so the nurse could assess Plaintiff and explain to him the importance of taking a decontamination shower after being subjected to chemical agents. The nurse began speaking to Plaintiff at 11:05 a.m. She told him that it is important to take a shower to remove the chemical agents from his skin. Plaintiff walked around his cell, apparently ignoring the nurse. She told him that the longer it stayed on his skin, the more it would affect his eyes, sinuses, and breathing. He told the nurse, "It's alright." The nurse tried to visually assess Plaintiff, but Plaintiff yelled to get away from his door. Martin and the nurse walked away from Plaintiff's cell.

Plaintiff continued pacing around his cell and repeatedly looked out the window. After several minutes, Martin re-approached the cell and again asked Plaintiff if he was still

14

refusing to cuff up. Plaintiff did not respond. Martin advised that because Plaintiff was continuing to refuse to submit to hand restraints to exit his cell and take a shower within 20 minutes of the last application of chemical agents, a cell extraction team was being assembled. Plaintiff continued pacing about his cell.

2. Second Video

The second disk is a continuation of the first. Plaintiff was apparently attempting to wipe the chemical agents off of his cell floor, and then he unsuccessfully tried to cover the window on his cell door. At 11:20 a.m., when the sergeant approached his cell, Plaintiff still refused to cuff up and told the sergeant that he was "ready to die today," and then he stated, "I don't give a f*ck, tell them to come on with it." Plaintiff started yelling to another inmate describing the property he had in his cell. Plaintiff was ordered to get off of the door, but he refused, and told the staff member, "f*ck you . . . kiss my ass f*ck boy," and he continued to communicate with the other inmate. Plaintiff told the staff member, "You ain't no mother f*cking tough guy man."

Plaintiff was able to completely cover the window on his cell door, which blocked the view into his cell. Another inmate warned Plaintiff that they were coming, and Plaintiff said, "I know." The cell extraction team approached Plaintiff's cell, and Martin gave Plaintiff a final warning but Plaintiff remained silent.

This video provides a clear view of Plaintiff charging out of his cell when the door opened for the cell extraction team to enter,[5] but the video is not at an angle that provides a clear view of what happened inside of Plaintiff's cell after he is pinned to the bunk. After

_____

[5] 14:39-elapsed time on the video.

15

the extraction team has Plaintiff restrained, he is escorted from the cell and the left side of his face can be briefly viewed on this video. This video follows him to the shower cell but then stops before he enters the shower.

### 3. Third Video

The third disk is from a separate handheld camera. The camera operator introduced himself and stated the date and time on the camera (October 25, 2012, 11:27 a.m.). Martin, who was standing with the cell extraction team members, described the events leading up to that point. She stated that Plaintiff had been creating a disturbance on the wing, yelling obscenities onto the wing, and refusing to submit to hand restraints. She stated that he had already received three applications of OC (chemical agents), but was still refusing to submit to hand restraints. She explained that she and another staff member attempted to counsel Plaintiff, but he would not comply. She advised that the duty warden authorized the use of a forced cell extraction team. Each cell extraction team member introduced himself and stated his responsibilities upon entering Plaintiff's cell.[6] Martin advised the team members that they were not sure whether Plaintiff had a weapon; they had not seen him with one. She instructed the team to only use the minimum amount of force necessary to control and restrain Plaintiff.

The extraction team marched in an organized fashion to Plaintiff's cell. By this time, Plaintiff had covered the window to his cell, so the team members could not see into the cell.

---

[6] Defendant Kirkland was the #1 man into the cell. He would carry the shield into the cell and use it to the pin the inmate to the cell floor, wall, or bed. Defendant Jackson was the #3 man and he was responsible for Plaintiff's upper extremities and applying handcuffs. He was also responsible for signaling that the inmate's hands were cuffed by stating loudly, "cuffs on." All members of the team had been trained in forced cell extractions.

Martin verbally provided Plaintiff a final order to submit to hand restraints or a cell extraction team would enter his cell. Plaintiff did not respond. Martin looked under Plaintiff's cell door, and she advised the team that Plaintiff was standing right at the door.

The door was opened[7] and Plaintiff charged the extraction team members. There was a lot of violent movement in the first several seconds, and the shield was dropped. It appears that Plaintiff fell to the floor and then continued to attempt to aggressively resist the officers. Plaintiff was repeatedly instructed to "stop resisting." Plaintiff was subsequently pinned on his bunk.[8] About 15 seconds after the door was opened, someone yelled for the shield to be taken out and the shield was completely out of the cell within seconds.[9] Plaintiff can be heard yelling, "Ow," twice. About 25 seconds after Plaintiff's cell door was opened, someone yelled "leg irons on."[10] Plaintiff was continually told to "stop resisting." It appears that he is pinned on his right side or stomach. About 42 seconds after entering Plaintiff's cell,[11] there were approximately 8 repetitive pounding sounds while a team member told Plaintiff to "stop resisting," and Martin yelled, "Stop resisting . . . put your arms down . . . put your arms behind your back and stop resisting." She then announced that "the inmate [wa]s continuing to resist," and asked the team members to put him on his back. Plaintiff was repeatedly told to "stop resisting." Approximately 1 minute and 8 seconds after entry into

---

[7] 3:45-elapsed time on the video.

[8] 3:54-elapsed time on the video.

[9] 4:04-elapsed time on the video.

[10] 4:10-elapsed time on the video.

[11] 4:27-elapsed time on the video.

17

Plaintiff's cell, he yelled, "trying to break my mother f*cking finger,"[12] and Martin replied, "you are continuing resisting, do you understand that?" Plaintiff said, "Yeah yeah ok ok," then yelled, "Ow."[13] A team member and Martin both ordered him to stop resisting. Martin directed Plaintiff to "give them your wrist." Plaintiff responded, "alright they got it." Martin looked and said, "uh no."[14] Around 1 minute and 25 seconds after the door was opened,[15] someone said, "cuffs on," and Martin confirms, and about 4 seconds later, someone yelled, "leg restraints on."[16] Several seconds later, Plaintiff is told, "Quit resisting your wrist, stop resisting, you understand me . . . stop resisting."[17] Martin assisted with securing the restraints on Plaintiff's ankles,[18] and she instructed him to "be still," to which he responded, "I am still." About 2 minutes and 38 seconds after Plaintiff's door was opened, Martin stated, "they're going to stand you up and walk you out of here."[19] Plaintiff was assisted to his feet and twice asked if he was ready to receive a shower, but he did not respond. He was escorted out of his cell and to the shower. There was obviously injury to the left side of Plaintiff's face, but the video does not show a clear close-up of the injuries.

---

[12] 4:53-elapsed time on video.

[13] 5:01-elapsed time on the video.

[14] 5:07-elapsed time on the video.

[15] 5:10-elapsed time on the video.

[16] 5:15-elapsed time on the video.

[17] 5:17 to 5:25-elapsed time on the video.

[18] This can also be seen on the second video around 16:45-elapsed time on the second video.

[19] 6:23-elapsed time on the video.

Plaintiff was kept in restraints in the shower due to his combative behavior. The camera operator announced that the shower began around 11:36 a.m. During Plaintiff's shower, he repeatedly asked, "Who was that punching me in the face?," and he repeatedly threatened to kill one of the extraction team members. A nurse came to the shower cell to examine Plaintiff. She asked Plaintiff if he had any cuts or abrasions that he wanted to tell her about, and he responded, "What does it look like? Does it look like I got abrasions?" She then asked him, "What about the rest of your body?" but Plaintiff continued yelling threats to the extraction team members. He was instructed to speak to the nurse, but instead, he said, "I'm done talking." He was then removed from the shower cell at 11:51 a.m.

The left side of Plaintiff's face is visible, but it is still difficult to tell the severity of the actual injury. It appears to be, as the nurse documented, swollen and bruised. Plaintiff continued to threaten staff while being escorted to his cell. He said, "I like this type of sh*t, man. You like it. I love it. You all like it. I love it. I wasn't ready for you this time but I'll be ready next time. . . . First mother f*cker gonna get it." He continued to make threats while staff removed the restraints and after his cell door was closed. The camera operator reported the time as 11:54 a.m. Martin provided a closing on the camera, and the video concluded at 11:55 a.m.

### III.  Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" <u>Hinkle v. Midland Credit Mgmt., Inc.</u>, 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting <u>Jurich v. Compass Marine, Inc.</u>, 764 F.3d 1302, 1304 (11th Cir. 2014)); <u>see</u> Fed. R. Civ. P. 56(a). "A

genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Bowen v. Manheim Remarketing, Inc.</u>, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); <u>see</u> <u>Hornsby-Culpepper v. Ware</u>, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." <u>Hornsby-Culpepper</u>, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote and citation omitted); <u>see</u> <u>Winborn v. Supreme Beverage Co. Inc.</u>, 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting <u>Shiver v. Chertoff</u>, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Loren v. Sasser</u>, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir.1990) (internal quotations omitted)).

Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In cases involving video evidence, the Court will accept the video's depiction of the events if the video "obviously contradicts" the opposing party's version of events. See Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010); see also Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) (recognizing that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [the non-movant's] version of what happened." Shaw v. City of Selma, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

### IV.  Analysis

Plaintiff acknowledges that his refusal to submit to hand restraints warranted some degree of force. Doc. 42 at 4. He does not take issue with the chemical spraying, but rather focuses on what happened inside his cell with the extraction team. He readily admits (and it can be clearly seen on the second video disk) that he charged the extraction team when his cell door opened. But he asserts that the force used after "he was down, restrained, and no longer resisting" was unconstitutional. Id.

**A. Eighth Amendment Standard**

The Eighth Amendment prohibits the infliction of cruel and unusual punishment.  U.S. Const. amend. VIII. "[T]he core judicial inquiry is . . . whether force was applied in a

good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). "If force is used 'maliciously and sadistically for the very purpose of causing harm,' then it necessarily shocks the conscience." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam) (quoting Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987)). Courts consider the following factors when analyzing whether force was used maliciously and sadistically:

> (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)); Miles v. Jackson, - - - F. App'x - - -, 2018 WL 6433684, at *1 (11th Cir. Dec. 7, 2018). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting Cockrell, 510 F.3d at 1311).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9 (citation omitted). "While a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'" Smith v. Sec'y, Dep't of Corr., 524 F.

App'x 511, 513 (11th Cir. 2013) (quoting <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010)). "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" <u>Stallworth v. Tyson</u>, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting <u>Brown</u>, 813 F.2d at 1188).

**B.  Relevant Factors Regarding Whether Force was Used Maliciously and Sadistically**

<u>1. Extent of Injury</u>

In Plaintiff's Declaration, he describes his injuries:

> As I began to rinse off the chemical agent and blood from my face and body[,] I assessed the damage done to me by the hands of the defendants. The left side of my face was deformed with swelling. I had large knots all over my head and skull. My left hand felt broken and was swollen. I had a deep cut inside of my mouth, a large laceration on my arm and immediately I knew that something was really wrong with my left eye.
>
> . . . .
>
> Because of the unnecessary and brutal beating of the defendants[,] I suffered numerous injuries. Of the most severe were injuries to my left eye and my left hand which have never healed and I believe to be permanent injuries, which have not healed to this day. Other injuries were to my neck, a concussion, large and painful swelling and bruising to my face and head, which left my face deformed, as well as deep lacerations on the inside of my mouth, and right forearm along with minor cuts and abrasions.

Doc. 42-1 at 8, 9. Plaintiff, however, refused medical treatment after he was extracted from his cell and had taken a shower, so the nurse could only document the injuries she could readily see upon visual inspection while Plaintiff was in the shower cell. The medical record

shows that Plaintiff had bruising to his left eye with a large amount of edema extending down to his jawline. <u>See</u> Ex. B at 3-4. Because Plaintiff refused further assessment and treatment, the nurse could not document any other injuries.

While the videos show the left side of his face was injured, it is difficult to see the extent of the actual injury, but it appears to be bruised and swollen. Plaintiff's arms were sporadically visible in the shower and when he walked back to his cell; he did not appear to be bleeding or have any lacerations. Despite Plaintiff's description of his injuries, the evidence shows that his injuries were not so serious that he needed immediate medical attention. <u>See</u> Plaintiff's Declaration (Doc. 42-1) at 8 ("While in the shower stall Nurse Glover tried to assess me, not in the best state of mind I refused medical attention, however later that nite [sic] I did complain to Nurse Glover on her rounds about some of my injuries and <u>eventually</u> signed up numerous times for sick-call to seek medical attention for my most severe of injuries." (emphasis added)). He testified at deposition that in the evening on the date of the cell extraction, he told the nurse on her rounds that he thought he had a concussion, and she responded, "Okay, well, I'll try to get back to you." Doc. 36-1 at 16 ("I really didn't say anything. I just complained, I just mentioned it to her, and I had a deep cut inside my mouth, like a really deep cut, I thought it might need some stitches, and I complained to her about that, I think I got a really deep cut. . . . Honestly, I'm gonna be honest with you, I really just toughed it out, man.").

It is reasonable to suspect that Plaintiff would have some injury after being sprayed with chemical agents multiple times and then being physically removed from his cell, especially given Plaintiff's physical resistance. However, it took him eight days (November

2, 2012) to submit his first sick-call request regarding his left eye: "I need medical attention for my left eye that was damaged during a cell extraction. I keep having flashes of white light in this eye, as well as pain [and] discomfort with impaired vision." Doc. 42-2 at 4. He was assessed by medical staff on November 8, 2012. Id. at 9; Ex. B at 5. The treatment note reflects that Plaintiff's pupils were equal, round, and the left eye was sluggish but reactive. Doc. 42-2 at 9; Ex. B at 5. There was no deformity noted to the area around the left eye. Doc. 42-2 at 9; Ex. B at 5. Plaintiff was awaiting an appointment with optometry for a consult to address his concerns, and was referred to the clinician to evaluate his left eye. Doc. 42-2 at 9; Ex. B at 5

Twenty days after the cell extraction (November 14, 2012), Plaintiff submitted another sick-call request:

> I need medical attention for my left thumb about (3) weeks ago while being cell extracted an officer[20] wrenched my thumb backwards, I think it may be broken. Its been (3) weeks since the injury and I'm still having pain and discomfort [and] I have almost no range of motion with my thumb. When the injury originally happened my whole left hand swelled up and was black and blue. This is the first time I've sought medical care because the pain will not go away.

Doc. 42-2 at 5 (emphasis added). He was evaluated for his complaints regarding his thumb on November 19, 2012. Id. at 11; Ex. B at 7. On November 29, 2012, Plaintiff's left thumb was x-rayed. See Doc. 42-2 at 27; see also Ex. B at 2 ("Plaintiff's medical records show that

---

[20] Plaintiff does not know who injured his thumb. At deposition, he testified: "I don't know who it was. It was either Jackson or one of the other officers. . . I'm not really certain which officer it was, but somebody tried to break my hand by wrenching my thumb back." Doc. 36-1 at 14. In his Declaration, he avers, "Some time during this beating one of the officers on the extraction team grabbed ahold of my left thumb and twisted and bent it viciously backwards in an attempt to unnecessarily break my thumb." Doc. 42-1 at 7.

he was given an x-ray following complaint of pain in his left thumb in November 2012. The records indicate that the x-ray was normal. Plaintiff was diagnosed with a mild subluxation of the left thumb."); Doc. 42-2 at 27 (radiology report dated November 29, 2012, indicating "[p]ossible mild subluxation . . . . No fracture or other acute process seen."). On December 5, 2012, and December 16, 2012, Plaintiff submitted sick-call requests regarding his thumb. Doc. 42-2 at 6-7. He was evaluated for his complaints regarding his thumb on December 6, 2012 (Doc. 42-2 at 13; Ex. B at 9), and December 18, 2012 (Doc. 42-2 at 14; Ex. B at 10), and he was referred to physical therapy (Doc. 42-2 at 14, 15, 19, 20; Ex. B at 10, 11, 16, 17). A medical note dated May 17, 2013, states that Plaintiff refused all future appoints for "PT," and on May 20, 2013, another note suggests that Plaintiff inquired about "PT; hand [and] eye appt" in a formal grievance, but the grievance was denied because he had refused "PT" appointments and he had an upcoming optometry appointment. Doc. 42-2 at 23; Ex. B at 20; see also Doc. 42-2 at 24; Ex. B at 22.

With respect to his eye, he complained again on December 16, 2012, that something was "seriously wrong with [his] eye," because he kept "seeing white balls of lite [sic], and [his] vision [wa]s impaired at times." Doc. 42-2 at 7. He was evaluated on December 18, 2012, at which time he had no complaints about his vision. Doc. 42-2 at 14; Ex. B at 10. On December 26, 2012, Plaintiff had been referred for an optometry consultation and an appointment was scheduled. Doc. 42-2 at 15; Ex. B at 11. On January 21, 2013, he submitted another sick-call request about his eye. Doc. 42-2 at 8. The following day, January 22, 2013, he was evaluated and found to have "poor visual a[c]uity." Id. at 16; Ex. B at 12. On February 22, 2013, Plaintiff was seen by the consultant. Doc. 42-2 at 17-18; Ex. B at 13,

15. According to Dr. Maier, "Plaintiff's medical records show Plaintiff had several eye exams in the first half of 2013. The only corrective action proscribed from these exams was a prescription for eye glasses. The records show Plaintiff had 20/25 vision in his left eye and 20/80 vision in his right eye on April 30, 2013. On June 19, 2017, Plaintiff had another eye exam which showed he had 20/25 and 20/70 vision respectively." Ex. B at 2.

In response to Plaintiff's sick-call requests, he was evaluated and treated. His medical records do not support his allegations of severe injury as a result of the cell extraction. The fact that Plaintiff made several sick-call requests does not mean that he had a serious injury. See generally Johnson v. Moody, 206 F. App'x 880, 884-85 (11th Cir. 2006) (affirming district court's grant of summary judgment in favor of defendants on inmate's excessive force claim; recognizing that while the inmate "complained of pain for several months, the objective medical evidence does not support his subjective complaints"). In light of the evidence presented, especially when considering Plaintiff's refusal of medical care immediately following the incident and eight-day delay in submitting his first sick-call request, the Court finds that Plaintiff, at most, suffered minimal injuries that were of the type to be expected given his resistance and the forced cell extraction. Of course, suffering only minor injuries does not defeat his excessive force claim, but does weigh against finding a constitutional violation.

## 2. Need for Application of Force

As Plaintiff recognizes, his refusal to comply with staff members' orders, even after verbal counseling and use of chemical agents, necessitated a need for force. The need for force was amplified when Plaintiff charged the extraction team members (the first of whom

was Defendant Kirkland) as soon as his cell door was opened. Considering the evidence presented, the degree of force used was necessary to gain Plaintiff's compliance. This factor weighs against finding a constitutional violation.

### 3. Relationship Between Need and Amount of Force Used

Staff utilized a series of techniques, beginning with verbal counseling and ultimately ending with the cell extraction, in an attempt to gain Plaintiff's compliance. Throughout the process, Plaintiff was afforded numerous opportunities to comply and provided with time to consider his decision. At each opportunity, Plaintiff declined and became increasingly aggressive and threatening toward staff.

The cell extraction team members were met with physical aggression immediately upon entering Plaintiff's cell. Despite being in a chaotic situation, the extraction team appeared calm and professional while attempting to fully restrain Plaintiff despite his resistance.

Plaintiff focuses on the force used in his cell after he stopped resisting. However, after the team announced that the cuffs and leg restraints were on, there were no additional violent movements inside the cell, and Plaintiff did not cry out in pain after that point. The unidentified repetitive pounding sound heard on the video occurred prior to this point. From the time the team entered the cell to the time Martin announced that the officers were going to stand Plaintiff on his feet, a mere 2 minutes and 38 seconds had elapsed. Plaintiff was standing on his feet and walking out of his cell on his own accord (with the officers having only a custodial grip on his arms) in approximately 3 minutes.

Under the circumstances, an appropriate amount of force was used to compel Plaintiff's compliance. This factor weighs against finding a constitutional violation.

### 4. Efforts to Temper Severity of Forceful Response

Staff attempted to gain Plaintiff's compliance before using any kind of forceful response. Plaintiff was repeatedly given the opportunity to comply with staff's verbal orders, but he refused. After the third deployment of chemical agents, a nurse came to Plaintiff's cell to encourage him to take a decontamination shower and advise him of the adverse effects of the chemical agents. Following the cell extraction, Plaintiff was immediately placed in the shower and a nurse came to examine him, but Plaintiff refused to discuss any issues with the nurse. During this time, Plaintiff was continually threatening to murder staff. The entire incident was videotaped, the duty warden had been notified, and superior officers were present during the cell extraction. This factor weighs against finding a constitutional violation.

### 5. Extent of Threat to Safety of Staff

During the administration of chemical agents, Plaintiff displayed threatening and aggressive behavior and verbalized threats against staff. He declared that he was "ready to die," thus evincing a general disregard for what happened to him. Plaintiff stood immediately behind his cell door, waiting for the extraction team to enter. He aggressively charged the cell extraction team members as soon as his cell door was opened. Given the length of time during which Plaintiff continued to resist orders to submit to hand restraints, his physical assaults on staff, and his verbal threats, it was reasonable for staff to consider Plaintiff a threat to safety.

At a minimum, the cell extraction team members, including the Defendants, knew that Plaintiff had been creating a disturbance on the wing, yelling obscenities onto the wing, and refusing to submit to hand restraints. They also knew that, despite receiving verbal counseling by at least two staff members and three applications of chemical agents, he was still refusing to submit to hand restraints as ordered. Presumably, given their location in the prison, Defendants knew that Plaintiff was housed in close management segregation. Upon approaching his cell, Defendants became aware that Plaintiff had covered the window to his cell door and that he was standing at the door waiting for it to open. They were unaware as to whether Plaintiff had a weapon. As soon as the cell door opened, Plaintiff rushed the extraction team members, the first of whom was Defendant Kirkland, and continued to aggressively resist. Defendants, faced with an aggressive and unpredictable inmate, were rightly cautious in their approach, and it is reasonable to assume that Defendants considered Plaintiff a threat to safety until he was fully restrained. This factor weighs against finding a constitutional violation.

### C. Findings

All five factors weigh against finding that the Defendants used force maliciously and sadistically. The undisputed evidence establishes that Defendants used some force to accomplish a legitimate security interest, i.e., to obtain Plaintiff's compliance with the order to submit to hand restraints, and that, at worst, Plaintiff received minimal injuries consistent with the amount of force which was necessary to restrain him. Defendants were forced to react to Plaintiff's initial attack, and they were required to make split-second decisions to complete their mission: to gain Plaintiff's compliance using the minimal amount of force

necessary. Defendants could not predict when, or if, Plaintiff would cease his disruptive behaviors, and even if Plaintiff stopped resisting, staff was still required to maintain control of the situation in case Plaintiff decided to become aggressive again. They did this inside of a cell that had just been sprayed with chemical agents, yet they executed their set protocol in a structured manner and used a reasonable amount of force given the threat with which they were faced. "Although [the Court] cannot pinpoint with precision the amount of force used by [Defendants], the fact that there was no more than minimal injury, that some amount of force was justified under the circumstances, and that the force was used for a legitimate security purpose persuades [the Court] that the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" Brown, 813 F.2d at 1189-90 (quoting Whitley, 475 U.S. at 322). Thus, focusing on "the core judicial inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Defendants did not use force maliciously or sadistically, but rather to maintain and restore discipline. Hudson, 503 U.S. at 7.

In some excessive force cases, the parties' competing versions of events are enough to defeat summary judgment. While the videos do not show every move made by each Defendant or by Plaintiff, they do document the scenario sufficiently to give an objective view of what happened. The videos also establish Plaintiff's aggressive and belligerent actions which contributed to the necessity of the force used against him and "obviously contradict" Plaintiff's contrary testimony. Pourmoghani-Esfahani, 625 F.3d at 1315; see also Oliver v. Warden, - - - F. App'x - - -, 2019 WL 549568, at *4-5 (11th Cir. Feb. 12, 2019); Buckman v.

31

Morris, 736 F. App'x 852, 853-54 (11th Cir. 2018). Even looking at the record in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff suffered a violation of his Eighth Amendment rights. Therefore, the Court will grant Defendants' Motion and enter judgment in their favor.[21]

Accordingly, it is

**ORDERED:**

1.      All claims against Defendant John Doe are **DISMISSED**.

2.      Defendants' Motion for Summary Judgment (Doc. 36) is **GRANTED**.

3.      The Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff and thereafter close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 4th day of March, 2019.

TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 3/4
c:
Lester W. Hill, #347288
Counsel of Record

---

[21] Given the Court's finding, the Court need not address Defendants' remaining arguments in the Motion.